WILLIAM FRIERSON *et al. v.* WILLIS BLANTON.

1. MORTGAGE. *With power to sell reserved to maker. Requires the title to be made by mortgagee. When.* The mortgage was made upon land to secure the payment of borrowed money, giving the mortgagee, upon failure of payment, the right to sell, free from the equity of redemption. The operative words of the deed conveying the title to the mortgagee are followed by these words: " Nevertheless, I retain the privilege of selling said land at any time, and to appropriate the proceeds first to the payment of the aforesaid debt."

*Held,* The mortgagor may contract, at any time prior to the note's maturity, for a sale of the land, and compel the mortgagee to credit the proceeds upon the* debt; and while the mortgagor has no power, either to convey the land or receive the proceeds, he may direct the same to be received by the mortgagee, who will then be bound to make the proper conveyance.

Cases cited: Lough Miller *v.* Harris, 2 Heisk, 557.

2. SAME. *Mortgagee may refuse tender. When.* Upon sale of the land in question, in April, 1861, the mortgagee made this written agreement: "I hereby agree to ratify and confirm the trade, provided the consideration paid, or to be paid, for said land, either in money or other lands, be paid to me on account

William Frierson *et al. v.* William Blanton.

of said mortgage debt, or such other lands stand bound to me for said debt." The mortgagor came in possession of the other lands by direct conveyance, and received the balance of the proceeds. In November, 1862, the mortgagor tendered the mortgagee the amount of the debt, in bank notes and Confederate money, and before the note was due.

*Held,* He was justifiable in refusing the tender, upon either ground, under the circumstances, as that was not in compliance with the agreement of April, 1861.

3. SAME. *Purchaser of mortgaged land, with notice, not entitled to value of improvements.* Where a purchaser of land has notice of an existing mortgage, he takes the property subject to the incumbrance, and stands upon the same footing as the mortgagor, and will not be entitled to the value of the improvements made by himself, upon foreclosure of the mortgage.
Cases cited: 5 Hum., 397.

4. SAME. *Decree to sell, on mortgagor waiving right of redemption. Must be made subject to redemption.* Where a mortgage contains a power to sell, free from the equity of redemption, the mortgagee may exercise the same, when the sale is made in pursuance of such authority, but if the sale be made under a decree of the Court, the right of redemption will still exist.
Cases cited: Cherry *v.* Brown, 4 Sneed, 415; Acts of 1833 and 1857-8; Code, 2,125.

5. SAME. *Equity of redemption. Statute must be strictly pursued.* The equity of redemption is a favorite of a Court of Equity, and to cut it off, the statute must be strictly pursued.
Cases cited: 2 Sneed, 558; 1 Heisk., McBee *v.*McBee.

---

FROM COFFEE.

---

Appeal from the Chancery Court. JAS. P. STEELE, Chancellor.

R. B. DAVIDSON and E. COOPER for Frierson *et al.*

WISENER & IVIE, P. C. ISBELL and JORDAN STOKES for Blanton.

McFARLAND, Judge, delivered the opinion of the Court.

18

This is a bill to foreclose a mortgage on the 1st day of January, 1860. Willis Blanton executed the mortgage in question, conveying to R. B. Davidson a certain tract of land therein described, to secure the payment of several notes, due at future dates (which are specifically set forth), payable to said Davidson, as administrator of Ervin J. Frierson, deceased. The operative words of the deed convey the title to the mortgagee, Davidson, but immediately following the description are these words: "Nevertheless, I retain the privilege of selling said land at any time, and of appropriating the proceeds first to the payment of the aforesaid debts." Then follows a covenant of seizin and warranty deed, also a power in the mortgagee to sell, in the event of a failure to pay the notes, the mortgagor waiving the equity of redemption. This deed was properly registered February 14, 1860.

On the 22nd of May, 1860, Blanton conveyed 96 acres of this land to Robert Wilson; the consideration received was another tract of land, conveyed to him by Wilson, and the balance secured by notes, which were afterwards paid, probably in Confederate money. Blanton afterwards sold other portions of the land to other parties. Davidson resigned as administrator of Frierson's estate, and the present complainants succeeded him as representatives, and the notes secured by the mortgage were resigned to them. They filed this bill to foreclose the mortgage for the unpaid balance, making Blanton and Wilson and the

William Frierson *et al. v.* William Blanton.

other subsequent purchasers of the land from Blanton
parties. Blanton and Wilson only defend. Wilson,
in addition to his defence by answer, filed a cross-
bill, in which he alleges that Blanton sold and con-
veyed the tract of land which, he (Wilson) conveyed
to him in exchange for the 90 acres, to one Shel-
ton, and received, Confederate money; the heirs of
Shelton (who had died) were made defendants, and it
was claimed that the conveyance to Shelton was void,
and that this latter tract must be substituted in the
place of the 90 acres, but it is not now argued that
Wilson is entitled to any relief upon this branch of
the case. Wilson had not only constructive but
actual notice of the existence of this mortgage before
his purchase.

The questions discussed mainly in argument are,
first, did Wilson obtain a title as against the mortgage
by virtue of his deed? This depends upon the con-
struction of the mortgage, and particularly of the
effect of the reservation of the power by Blanton to
sell. Does this reservation amount to an absolute
power upon the part of Blanton to sell and convey
all or any part of the land at any time, and receive
the proceeds, notwithstanding the mortgage.'

If so this reservation gave to the mortgagor
power to render the security of the mortgagee abso-
lutely nugatory. The mortgagee had no power to
sell, except upon the failure of the mortgagor to pay
the notes at maturity; but under this power, as con-
tended for, the mortgagor might, on the next day,

have conveyed the entire tract and received the proceeds, and defeated the security, or the mortgagor entirely. His declaration that he will himself pay the proceeds upon the debts would practically be little or no security to the creditor, more than he had before the deed was executed. It may be conceded that a reservation of a right or power following an absolute conveyance will ordinarily be operative as a re-grant of the right or power he reserved, for the deed must be taken altogether; but will this be so when the right or power reserved defeats, or may defeat, the effects and object of the conveyance absolutely?

In such a case, the principle that the conveyance must be so construed as to give it effect, rather than to destroy its effect, and, in that doubtful case, the words are to be taken most strongly against the grantor, and the clause repugnant to the main objects of the conveyance rejected will apply.

We construe this reservation to mean this: That while the mortgagee could only sell the land after the maturity of the notes, in the event they remained unpaid, *the mortgagor reserved the privilege to sell at any time, and apply the proceeds to the payment of the debts.* He might make a sale immediately, but *he reserved no power to convey;* this was inconsistent with the fact that the title was vested in the mortgagee; unless power to convey was reserved in unequivocal terms, upon the mortgagor selling or agreeing to sell at any time before the sale by the mort-

gagee, the mortgagee would be bound to receive the proceeds and apply the same to the debts, and make the necessary conveyance.   This construction does not render the reservation inconsistent with the language used, and gives effect to the entire contract, reasonable in itself, and in accordance with what we think must have been the intention of the parties.   At all events, we hold that the mortgagor could not convey to a purchaser having notice, any part of the mortgaged premises free from the incumbrances, without applying the proceeds to the payment of the debts.   It is true that it has been held that a purchaser, from a trustee having power to sell, is not bound to see the purchase-money applied, unless he have notice of the breach of the trust, or in case of fraud.  *Loughmiller* v. *Harris,* 2 Heisk., 557.   But here, as we have said, by reasonable construction, can it be held that the mortgagor was himself authorized to convey or receive the proceeds of the sale?   There is no express stipulation to that effect, and without an express stipulation to that effect, it is so inconsistent with the purposes of the mortgage that we could not so construe it.

We construe the reservation to mean a privilege to make a contract of sale and direct the proceeds to be received and applied to these debts, and a conveyance to be made at any time prior to the exercise by the mortgagee of his power to sell.

2nd. It is argued that the mortgagee (Davidson) is estopped to deny Wilson's title.   On the 11th of

April, 1861, he made a written statement, in which he says, in substance, that being informed of the purchase of Wilson, "I hereby agree to ratify and confirm the trade, provided the consideration paid, or to be paid, by said Wilson for said land, either in money or other lands, be paid to me on account of said mortgage debt, or such other lands stand bound· to me for said debt." It is not insisted that the other land received by Blanton was turned over to Davidson in place of his 90 acres, nor that the proceeds of the sale were paid to him, but it is insisted that in November, 1862, Blanton tendered to the complainants the amount of the mortgage debts, partly in bank notes and · partly in Confederate money, and that the same were refused only because the notes were not due.

This is not relied upon in Wilson's answer, and the · proof is in conflict. According, perhaps, to the weight of the testimony, Blanton, at the time stated, proposed to pay the debts in Confederate money, though there is doubt if it was formally tendered. The offer was refused, according to defendant's evidence, both because in Confederate money, and because the notes were not due.

We are of opinion that the complainants were justifiable in refusing the tender upon either ground, · unless it appears that the defendants, in good faith, proposed to comply with Davidson's proposition of the 11th of April, 1861, and in this event it would be bad faith upon their part to refuse to ratify the sale,

as he therein proposed, especially if it appear that Wilson, in making the purchase from Blanton, acted upon the faith of Davidson's proposal; but it will be borne in mind that this proposition was made by Davidson on the 11th of April, 1861. The proposition was to ratify the sale, upon the condition that the consideration paid, or to be paid, by said Wilson, in money or other lands, be paid to him on account of the mortgage debts, or such other lands stand bound to him for said debt." It does not appear that Wilson acted upon this proposition. Soon after, on the 22nd of May, he completed his purchase, but no effort was made to comply with the conditions prescribed. The other land given by Wilson in exchange was conveyed directly to Blanton, and the notes for the difference given to him. Some eighteen months after Blanton proposed to pay the mortgage debts in Confederate money. This was not Davidson's proposition, had no connection with it, and complainants were not bound to accept it as such.

The Chancellor was of this opinion. He directed the entire balance of the tract to be sold before selling the part claimed by Wilson. [This is only to be sold in the event the balance of the tract fails to pay the debts.] This was correct. It is conceded that part of the debts embraced in the mortgage are usurious. This portion of the debt is extracted from the decree.

The Chancellor deducted from the amount due on the mortgage the value of the permanent improve-

ments made by Wilson. To reverse this decree the complainants have prosecuted a writ of error.

We are aware of no principle upon which this part of the decree can be maintained. A mortgagor remaining in possession of the mortgaged premises is not, upon foreclosure, liable to the mortgagee for the rents received by him—5 Hum., 387—and certainly he can not be allowed to retain the rents and charge the mortgagee with the improvements. He receives the benefit of the improvements in the increased price for which the land sells upon foreclosure. In the view we have taken of this case, Wilson can stand upon no better ground than Blanton. He is the assignee of Blanton's equity of redemption, with full notice, and must stand in his shoes. In this latter respect the decree will be reversed.

For Blanton it is argued that the decree of sale for cash, without the equity of redemption, is erroneous. It is in accordance with the terms of the mortgage. It was held, in the case of *Cherry* v. *Brown*, 4 Sneed, 415, that such a provision in a mortgage was void, and the equity could only be cut off by decree under the Act of 1833.

This decision was met by the Act of 1857–8, Code, Sec. 2,125, which says: "The right of redemption does not extend to any sale under and by virtue of a power contained in any deed of trust, mortgage, or other instrument whereby the right is waived or surrendered by such mortgage or conveyance."

The question is, is this sale under and by virtue

of the power contained in the mortgage? The mortgage contained such a power of sale, but the mortgagee did not choose to exercise it. The complainants came into a Court of Equity for foreclosure. A sale is decreed by the Clerk and Master of the Court. When the sale is by the mortgagee, under the power, he cannot depart from the terms defined by the power or mortgage. When he comes into a Court of Equity, he is not bound to follow those terms. It is not essential that the mortgage contain any power of sale, or it may contain a power to sell simply for cash, to which the law attaches the equity of redemption; by the decree of foreclosure, these terms may be abandoned and the sale directed on the credit prescribed by the statute without the equity of redemption. In other words, if the mortgagee sell, his authority is the power contained in the mortgage. If the Clerk and Master sell, his authority is the decree of the Court.

The equity of redemption should be controlled by the law applicable to the two classes of sale. The section of the Code referred to denies the equity, if the sale be under such a power as the present, but where the sale is by *decree* of Court, either upon *foreclosure* of a mortgage, deed of *trust*, or otherwise, the power of the Court is only to cut off the equity at the instance of the complainant, and upon selling on a given credit. The right of redemption is a favorite of a Court of Equity, and, to cut it off, the statute must be strictly pursued. 2 Sneed, 558; 1

Heisk., *McBee* v. *McBee.* We are of opinion that, in this respect, the decree should be modified, and, in other respects, affirmed.

The costs of this Court will be paid, one-half by complainants, and one-half by Wilson and Blanton.